IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **MICHAEL HOWARD** <br><br> v. <br><br> **TAOS HEALTH SYSTEMS, INC. D/B/A HOLY CROSS HOSPITAL, QUORUM HEALTH RESOURCES, PETER HOFSTETTER, WES OSWALD, RICK EISENRING, TIM HOWARD, ANNA ABEYTA, LORETTA ORTIZ Y PINO, PER BJORKMAN, GAIL WALSH.** <br><br> **Defendants.** | **Case No. _____** <br> **FILED UNDER SEAL** <br> Pursuant to 31 U.S.C. §§ 3729 *et. seq.* (False Claims Act) <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

### INTRODUCTION

1. Qui tam relator, Dr. Michael Howard ("Relator" or "Dr. Howard"), by and through his attorneys, individually and on behalf of the United States of America, files this complaint against Defendants Taos Health Systems, Inc. D/B/A Holy Cross Hospital ("HCH"), Peter Hofstetter, Wes Oswald, Rick Eisenring, Tim Howard, Anna Abeyta, Loretta Ortiz y Pino, Per Bjorkman, and Gail Walsh (collectively, "Defendants") to recover damages, penalties, and attorney's fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* ("FCA").

2. Defendants are responsible for submitting or causing to be submitted, false claims to Medicare and Medicaid seeking reimbursement for services that were (1) completed by non-physician providers ("NPPs") without physician supervision, (2) performed by NPPs without

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

Medicare billing credentials, (3) improperly billed by NPPs under physicians' billing codes, and (4) billed at the 100 percent physician rate instead of the 85 percent non-physician rate for work performed by NPPs.  These practices violate Medicare regulations.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).  Dr. Howard's federal cause of action for unlawful retaliation is authorized by 31 U.S.C. § 3730(h).

4. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants transact business in this judicial district.

5. Venue is proper in this Court under 28 U.S.C. §1391(c) and 1395(a), and 31 U.S.C. § 3732(a) because the complained of illegal acts occurred within this judicial district, Defendants are residents of this district, and because Defendants transact business within this judicial district.

## PARTIES

6. Relator Dr. Howard is a citizen of the United States and a resident of Arroyo Seco, New Mexico.

7. Including his residency at the University of New Mexico, Dr. Howard has nearly twenty years of experience in the healthcare industry, including extensive experience in treating patients consistent with hospital polices relating to billing for such care.

8. From December 1998 through November 2013, Dr. Howard served as an emergency physician for Defendant HCH.

9. From 2009 to 2011, Dr. Howard served as Chairman of the Department of Emergency Medicine at HCH

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

10. From 2011 through January 2013, Dr. Howard served as Chief of Staff of HCH.

11. Defendant HCH is located in Taos, New Mexico and provides a range of medical services to its customers, including surgical services, a dermatology clinic, women's health services, and emergency services.

12. The payer mix for HCH's patients is as follows: 33% Medicare; 6% Medicare Advantage; 18% Medicaid; 11% Self Pay; 32% Insurance/Other.

13. Defendant Quorum Health Resources provides executive level staffing, consulting services, and management services for HCH.

14. Quorum met with HCH executives on a quarterly basis to discuss management and financial issues with HCH.

15. Quorum often provided HCH with guidance on Medicare and Medicaid issues.

16. Defendant Quorum provided Peter Hofstetter, Rick Eisenring, Wes Oswald, and Tim Howard as executives to HCH.

17. Peter Hofstetter is currently the Chief Executive Officer ("CEO") of HCH.

18. Wes Oswald served as the Interim CEO of HCH from 2008 through 2009.

19. Rick Eisenring served as Chief Financial Officer ("CFO") of HCH from 2002 through 2012.

20. Tim Howard currently serves as the Interim CFO of HCH.

21. Anna Abeyta currently serves as Registered Nurse ("RN"), Chief Nursing Officer ("CNO").

22. Loretta Ortiz y Pino currently serves as the Chief Medical Officer ("CMO") of HCH.

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

23. Dr. Per Bjorkman currently serves as the Emergency Department Director of HCH.

24. Gail Walsh served in the Compliance/Risk Management department until in or about April 2014.

## FACTUAL ALLEGATIONS

*Non-Physician Providers*

25. Non-Physician Providers ("NPP") refer to physician assistants and nurse practitioners.

26. HCH also refer to NPPs as Allied Health Professional ("AHP"), Mid-level Provider ("MLP"), and Advanced Practice Provider ("APP").

27. When Dr. Howard first began working at HCH, it was not using NPPs to perform procedures.

28. In 2002 or 2003, the HCH emergency department began hiring NPPs.

29. Dr. Fraker and Dr. Moller initiated the NPP program, and had many conversations with Dr. Howard and his colleagues about the program.

30. CNO Abeyta was the program supervisor for the NPPs when the program started and she was responsible for ensuring that NPPs had proper credentials so that they could bill to Medicare and Medicaid.

31. NPPs should bill their services at 85% of the physician charge.

32. Dr. Fraker, Dr. Moller, Spellman and Abetya told Dr. Howard that the NPPs were credentialed and that services could be billed under their name, although HCH would prefer that all services be billed under the physician in order to be reimbursed at a higher rate.

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

33. Dr. Fraker, Dr. Moller, Spellman and Abetya also told Dr. Howard that NPPs could work independently under their supervising physician if necessary.

34. Dr. Fraker and Dr. Moller and the members of the HCH administration repeatedly told Dr. Howard that it was HCH's policy for him to sign off on every chart regardless of his level of supervision of the patient.

*Billing to Medicare*

35. Medicare can only make payments to an eligible provider. A provider becomes eligible to provide services and receive payments under Medicare after completing the enrollment process and agreeing to comply with certain provisions.

36. Medicare regulations require state licensure in order to bill for services.

37. Medicare providers must have a National Provider Identifier ("NPI") number in order to receive payment for Medicare claims.

38. A provider or supplier's Medicare billing privileges may be revoked if the provider or supplier is determined not to be in compliance with the Medicare regulations.

39. HCH is an authorized provider of services and is eligible for repayment under Medicare.

*HCH fraudulently billed Medicare by allowing NPPs to evaluate patients without physician supervision.*

40. The Medicare manual specifies that if the patient does not have face-to-face contact with a physician – even if the physician reviewed the patient's medical record – then the service may only be billed under the NPP.

41. HCH medical charts contain a preprinted check box system to denote the manner in which a patient was seen. The charts did not contain a category to note that the patient was seen only by an NPP and not by a physician.

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

42. Dr. Howard generally asked NPPs to leave the medical charts on the table in front of him until he had time to examine the patients and review their charts.

43. Sometimes the NPPs placed the charts on the discharge rack and Dr. Howard did not see the charts, and thus the NPP discharged the patient without Dr. Howard's knowledge or evaluation. Dr. Howard would find the charts later in the stack to be signed.

44. On rare occasions, Dr. Howard was so involved with a critical patient that he told the NPP they could discharge those patients.

45. In 2009, a male patient developed necrotizing fasciitis after an NPP, Paul Birge, sutured a laceration and discharged the patient without Howard being aware of the case until after the fact. The patient died as a result of the infection.

46. A lawsuit followed the incident and Hofstetter, Abetya, Dr. Moller and Risk Manager Patty Hannigan were involved.

47. On July 26, 2010, Hofstetter wrote to Dr. Howard and asked him if physicians routinely see patients, who are evaluated by NPPs.

48. Dr. Howard responded stating that he brought up these issues several times and did not have a clear understanding of what the standard of care was for the issue, as he was not aware of a written policy. Dr. Howard explained that in the past, HCH has advised that the physicians should "try and see" each patient.

49. Hofstetter then asked if HCH should articulate expectations. Dr. Howard agreed and also told Hofstetter that he wondered how billing was done for the patients he did not evaluate.

50. Hofstetter replied that he did not mean to suggest that Dr. Howard should see all patients, just stop in and say "hello."

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

51. Hofstetter added, "no big deal, just trying to think through the PR issues…"

52. The lawsuit ended in a settlement agreement, which required NPPs to "present" a patient to the physician prior to discharge.

53. Also by terms of the agreement, HCH instituted a policy requiring physicians to supervise every chart.

54. However, because the terms "presented" and "supervised" were ambiguous, physicians and staff were not clear if these terms if "face-to-face" contact with the patient was required. HCH suggested that physicians "try to see" every patient.

55. The NPPs told Dr. Howard that he was much more likely to want to supervisor their cases than some other physicians, including Dr. Bjorkman, Dr. Fraker and Dr. Oskar Moller.

56. From about 2010 on, Dr. Howard wrote directly on the medical charts "did not see patient" with his initials, if he did not physically evaluate a patient that was seen by an NPP.

57. In or about April 2011, HCH advised its staff that supervising physicians may supervise multiple NPPs. HCH also advised its staff that NPPs must inform the board of the name of physician under whose supervision they will practice, and the supervising physicians are required to submit written notice of their intent to supervise NPPs.

58. Dr. Howard did not want to participate in this program and thus did not submit a written notice of intent to supervise NPPs.

59. At this point, Dr. Howard assumed that NPPs were billing under their own NPIs and signed off on all medical charts, as he was previously instructed to do.

*Independent coding specialist reviews physician – not NPP – medical charts*

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

60. In the fall of 2011, HCH hired an independent organization, Peak Performance Physicians, to review the HCH's procedures and accuracy in regards to its medical charts, medical coding and the billing of its services.

61. The specialist was not aware that HCH used NPPs to evaluate patients and was not clear on how HCH billed for its services.

62. In December 2011, Dr. Howard had a telephone call with the specialist to review his charts, several of which were actually charts completed by NPPs who had seen the patients and completed the charts. The specialist asked Dr. Howard why his handwriting was different on some charts, and he explained that HCH used NPPs to evaluate patients.

63. Despite Dr. Howard's explanation, to his knowledge, the coding specialist reviewed only the medical charts completed by physicians, and not the medical charts completed by NPPs, which constituted approximately one third of the medical charts.

64. The review of Dr. Howard's charts determined that he performed in the upper third of his colleagues.

65. After the review was complete, HCH did not discuss the results of the review and to Dr. Howard's knowledge, HCH did not implement any changes to the emergency department.

***Dr. Howard discovers that NPPs lacked necessary credentials to bill Medicare***

66. As Chief of Staff in 2011, one of Dr. Howard's duties included membership on the credentials committee where he discovered that the credentialing process was largely deficient under the previous credentials committee chairman, Dr. Bjorkman.

67. On February 29, 2012, Dr. Howard sent an e-mail to the HCH credentials committee, informing them that that HCH physicians were not conforming to DNV hospital accreditation standards and were not properly adhering to a peer review process for evaluations.

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

68. Following Dr. Howard's e-mail, HCH held a series of meetings with senior medical staff, including Jack Garland, Walsh and Linda Chase to address the physician credentialing issue.

69. Dr. Howard also suspected that the NPPs were not credentialed at all with the Centers for Medicare & Medicaid Services ("CMS"), and were billing their services through the NPIs of their supervising physicians.

70. For instance, in the earlier 2009 incident that resulted in a patient's death, the NPP billed the procedure under Dr. Howard's NPI.

71. Once Dr. Howard learned that it was likely that NPPs did not have adequate credentials for billing, he asked the NPPs not to discharge patients so that he could see them.

72. However, this was not always possible and the NPPs varied in their consistency of discussing their patients with the attending physician.

73. In an effort to correct this issue, Dr. Howard helped to create and select a Chief Medical Officer ("CMO") for HCH.

74. HCH hired Dr. Ortiz y Pino as its new CMO, whose duties were to participate in decisions relating to nursing staffing, regulation and the budget. Her role was to be a liaison between the administration and the physicians.

75. She was also responsible for making HCH compliant with Medicare regulations and the Affordable Care Act.

76. On or about March 16, 2012, Quorum presented a PowerPoint to HCH for its 2012 annual planning retreat. The PowerPoint contained a listing of 2012 legislative session which included Medicaid Fraud Prevention and Medicaid False Claims Act.

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

77. In or about March 2012, Dr. Howard also asked Christa Castro, an NPP, to research the proper procedures and requirements for credentialing NPPs in the emergency department.

78. Castro joined HCH's credentialing committing as the first non-physician member of the committee.

79. Castro sent Howard some alternate supervising forms, which included more signature spaces to allow for more physicians to act as alternative supervisors for an NPP.

80. Dr. Howard forwarded the e-mail to Dr. Ortiz y Pino and others suggesting that they review the form and consider how it may fit into the credentialing process.

*HCH expressed concerns about low average medical bills*

81. In October 2012, Hofstetter sent an e-mail to emergency physicians expressing his concern that HCH's medical bills were low, resulting in low revenue.

82. Hofstetter also provided the physicians with only a limited breakdown of physician charges and collections for the emergency department and claimed that the hospital was subsidizing the physicians at the rate of $1 million a year.

83. Throughout 2013, HCH did not change its policies relating to having physicians sign off on all patients' charts, and Dr. Howard continued to be concerned that NPPs were billing under his name and NPI. He and others repeatedly discussed the issues with his colleagues and voiced his concerns to the hospital's administration.

*HCH billed to Medicare work performed by NPPs at the 100 percent physician rate instead of the 85 percent NPP rate.*

84. On February 16, 2013, Castro sent an e-mail to several NPPs and physicians stating that it was brought to her attention that some patients were leaving the emergency room without the attending physician seeing the patient.

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

85. Castro further stated that the issue is not the competence of the NPPs but rather a billing issue.

86. Castro stated "we are committing fraud because we [NPPs] bill for MD [physician] service."

87. In July 2013, Castro sent an e-mail to several HCH physicians and an executive explaining that NPPs needed to have official documentation of physician and NPP supervision, as was previously outlined in the April 2011 legal memorandum. Castro also noted that NPPs needed to bill under their own NPIs.

88. Because NPPs did not have adequate credentials, NPPs were not able to bill patients at 85 percent the rate of physicians.

89. Instead, NPPs who did not have adequate credentials, billed patients at the 100 percent physician rate, even though many of these patients never had a face-to-face visit with a physician.

*HCH repeatedly acknowledged its fraudulent billing*

90. In March 2013, HCH physicians had a meeting, during which they discussed billing.

91. On March 23, 2013, Dr. Jonathan Rudolf sent an e-mail to several HCH physicians including Dr. Howard, Dr. Bjorkman, and others.

92. Dr. Rudolph noted that there were billing issues: the amount of supervision needed and the accuracy of the billing completed under the physician's names.

93. Dr. Rudolph noted that if direct physician face-to-face involvement was required in every case, then he would rather use a scribe or personal assistant, rather than an NPP, as a scribe would do exactly what he wants under his direction.

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

94. Dr. Rudolph further stated that HCH should not be billing as if there was physician face-to-face involvement, he noted that this was fraud and most certainly illegal.

95. Dr. Rudolph stated that he never received feedback on what billing was done under his name.

96. On August 27, 2013, Dr. Ortiz y Pino, the new CFO Tim Howard, Walsh, and Abeyta, called a meeting to discuss billing compliance issues within the emergency department.

97. Most, if not all, of the medical providers were present or on conference call

98. During this meeting, Dr. Ortiz y Pino, Walsh, Abetya the hospital administration admitted their failure to bill appropriately and to credential/enroll any of the non-physician providers with the payors, including Medicare and Medicaid.

99. The administration was not clear about the responsibility for reporting or the length of time this has been going on. They did not reveal how they had finally come to this new decision.

100. During this meeting, Tim Howard reported that the hospital had "at least a liability of $2.5 million but it could be more" or words to that effect.

101. In defense, Dr. Ortiz y Pino insisted that "everyone does this" or words to that effect.

102. Dr. Ortiz y Pino and Walsh were very evasive and unclear about whether or not they would report these billing issues to CMS.

103. Dr. Howard asked directly at that meeting if the NPPs could perform procedures or critical care without being credentialed.

104. Dr. Ortiz y Pino and Walsh claimed it was covered with an attending "face to face."

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

105. Dr. Howard expressed concern that the topic had been addressed repeatedly and that he had previously been assured that all of the billing was being done correctly even in the cases where the physicians could not or did not see the patients.

106. Dr. Howard told Tim Howard in that meeting that physicians had never received accounting of their billing and they wanted it.

107. Tim Howard agreed to provide the physicians with the accounting of their billing, but actually never provided this information to the physicians.

*Dr. Howard discloses his concerns to Hofstetter and files a whistleblower complaint*

108. After the mandatory meeting, Dr. Howard, while working in the emergency room, spoke with Hofstetter.

109. Dr. Howard expressed disappointment with the HCH's inaction relating to the billing and told Hofstetter that he was concerned that HCH had put him and his colleagues at risk for fraud.

110. Hofstetter told Dr. Howard that he did not have to "worry" about liability for the inappropriate billing because the hospital "usually pays for this sort of thing" (or words to that effect).

111. After the August 27 meeting, Dr. Howard realized that the procedures and critical care issue was not solved by a face-to-face with a patient. Physicians and NPPs can share billing for some forms of treatment with their supervising physicians. However, Medicare guidelines specify that in the case of procedures and critical care, the billing cannot be shared. If a physician sees a patient, and if the NPP performs a procedure or critical care, the NPP must bill the procedure under their own NPI.

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

112.	Realizing this additional potential fraud and seeing that HCH was not taking any steps to become complaint with Medicare regulations, on August 30, 2013, Dr. Howard filed a whistleblower report online with the Health and Human Services Inspector General.

***HCH admits that it never billed services under NPP's NPIs.***

113.	On September 12, 2013, Dr. Howard attended the monthly emergency department meeting.

114.	Walsh was scheduled to present compliance information related to NPPs examining patients. She had prepared a handout, however she did not include the complete language from CMS.

115.	Dr. Ortiz y Pino revealed that the HCH never billed for services performed by NPPs and that these services were probably billed under the physicians' NPIs.

116.	Dr. Howard became concerned that the practice of billing for NPPs at the full physician rate spanned back to 2002 or 2003, when HCH first began using NPPs.

117.	Walsh also admitted that NPPs were not using NPIs and that HCH just began completing the proper credentialing process for NPPs with Medicare and Medicaid.

118.	Dr. Howard asked whether HCH should self-report immediately.

119.	Dr. Ortiz y Pino claimed that HCH could not self-report until it audited 200 medical charts.

120.	Dr. Ortiz y Pino said that from her preliminary assessment 90% of the charts for patient seen by NPPs were inadequate and HCH could only justify 10% of the billing from the NPPs.

121. Dr. Caplin, Dr. Mikkelson, and Dr. Lynch raised their concerns about the billing and stated that they were concerned about fraud. They were also concerned about how to sign off on these medical charts in the future.

122. Dr. Ortiz y Pino and Walsh did not provide the physicians with clear answers and told them to continue to the sign medical charts, including those charts which contained procedures performed by NPPs.

123. Dr. Ortiz y Pino said "we have been doing this for ten years...we're not special" or words to that effect.

124. Walsh said "this is done in 80% of the hospitals" or words to that effect.

125. Following the meeting, it was unclear if HCH had properly credentialed NPPs with CMS and if HCH had begun to start using the NPPs NPIs, and not those of the attending physician.

126. During this time, in or about September 2013, Dr. Howard worked with Castro on drafting a NPP policy.

127. In October 2013, Dr. Howard cut and pasted exact CMS statements into the proposed policy but someone else edited them out.

128. On October 12, 2013, Dr. Rudolf wrote to several physicians and Castro suggesting guidelines for physicians assigned to supervise NPPs.

129. Dr. Rudolf suggested that HCH eliminate the words such as "must" and "always" as a requirement for the physician to physically see and examine the patients.

130. Dr. Rudolf added, "We must be sure to create policies of which we will not always be in violation."

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

131.   An NPP agreed stating that "there should be no hard rules, no 'always' or 'must' or 'never' as this will paint us into a corner and put major limits on what we can do."

*Extent of fraud*

132.   The HCH emergency department examined about 14,000 patients per year; one third of which were examined only by NPPs, not physicians.

133.   Of those patients, about half the patients required services billed to Medicare.

134.   Most, if not all, of the NPPs were not properly credentialed under Medicare and thus billed their services under a physician's NPI, rather than their own NPI.

135.   The improper billing spanned back at least six years.

*HCH retaliates and terminates Dr. Howard*

136.   In mid-November 2013, Dr. Howard and his wife, Dr. Doherty were named to the newly formed joint committee of the Taos Town and County, which was assigned to review HCH's financials.

137.   On November 20, 2013, HCH terminated Dr. Howard and later filled his position with a locum tenens physician.

## COUNT I

**Defendants Peter Hofstetter, Wes Oswald, Rick Eisenring, Tim Howard, Anna Abeyta, Loretta Ortiz y Pino, Per Bjorkman, and Gail Walsh Knowingly Presents, or Causes to be Presented False or Fraudulent Claims for Payment or Approval in Violation of FCA, 31 U.S.C. §3729(a)(1)(A)**

138.   Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

139.   Defendants violated the FCA, 31 U.S.C. § 3729, when they "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" when they knowingly presented, or causes to be presented, false claims to the

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

government, through Medicare containing billing codes which reflect services that were not rendered.

140.  Defendants are responsible for submitting or causing to be submitted, false claims to Medicare seeking reimbursement for services that were (1) completed by NPPs without physician supervision, (2) performed by NPPs without Medicare billing credentials, (3) improperly billed by NPPs under physicians' billing codes, and (4) billed at the 100 percent physician rate instead of the 85 percent non-physician rate for work performed by NPPs.

141.  When Defendants submit bills for fraudulent services to Medicare, this triggers the program to pay out money to reimburse the claim.

142.  Defendants' submissions caused the Federal Government to pay out money for claims which they otherwise would not have paid.

143.  The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT II

**Defendants Taos Health Systems, Inc. D/B/A Holy Cross Hospital and Peter Hofstetter Retaliated Against Dr. Howard for Engaging in Acts Protected by the FCA, 31 U.S.C. § 3729(h).**

144.  Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

145.  As set forth above, and in connection with the foregoing scheme, Defendants HCH and Hofstetter knowingly submitted false claims for payment by the United States in violation of the FCA.

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

146. Dr. Howard engaged in activity protected under the FCA by engaging in lawful acts in the furtherance of a qui tam action under the FCA and other efforts to stop Defendants' violation of the FCA.

147. Following the August 27, 2013 meeting, Dr. Howard engaged in protected activity when he told Hofstetter that he was concerned that HCH had put the physicians at risk for fraud. Dr. Howard also engaged in protected activity when on August 30, 2013, he filed a whistleblower report online with the Inspector General Department of the U.S. Department of Health and Human Services. Dr. Howard again engaged in protected activity when during the September 12, 2013, monthly emergency department meeting, he asked Dr. Ortiz y Pino and Walsh if HCH should self-report the fraud immediately.

148. Dr. Howard's investigation and disclosures led in part to the instant qui tam action.

149. Dr. Howard's protected activity motivated, at least in part, HCH and Hofstetter's decision to terminate Dr. Howard.

150. To redress the harms he has suffered as a result of the acts and conduct HCH in violations of 31 U.S.C. § 3730(h), Dr. Howard is entitled to damages including two times the amount of back pay, interest on back pay, and any other damages available by law including litigation costs and reasonable attorneys' fees.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dr. Howard demands a jury trial.

**PRAYER FOR RELIEF**

WHEREFORE, the Relator Michael Howard, acting on behalf of, and in the name of, the United States of America and on his own behalf, prays that judgment be entered against Defendants for violations of the FCA as follows:

(a) For all costs of the False Claims Act civil action; and

(b) In favor of the United States against the Defendants for treble damages to the federal government from the submission of false claims, and the maximum civil penalties for each violation of the FCA.

(c) In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney's fees, and costs incurred by the Relator; and

(d) In favor of the Relator for back pay, front pay, compensatory damages, attorneys' fees and costs incurred by the Relator, and other economic or other relief as the Court might award, pursuant to 31 U.S.C. § 3730(h); and

(e) In favor of the Relator and the United States, for further relief as this court deems just and equitable.


Dated: April 16, 2014

Respectfully submitted,

**DAVIS, GILCHRIST & LEE, P.C.**

By:  /s/ **Bryan J. Davis**
Bryan J. Davis
124 Wellesley SE
Albuquerque, NM 87106
Tel. (505) 435-9908
Fax. (505) 435-9909
bryan@dglnm.com

And

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

        R. Scott Oswald, to be admitted pursuant to
Local Rule 83.3(A)
David L. Scher, to be admitted pursuant to
Local Rule 83.3(A)
The Employment Law Group, P.C.
888 17th Street, N.W., 9th Floor
Washington, D.C. 20006
Tel:  (202) 261 – 2810
Fax: (202) 261 – 2835
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com

*Counsel for Plaintiff-Relator*

**FALSE CLAIM ACT** *QUI TAM* **COMPLAINT UNDER SEAL**